**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| WILLIAM STRIEBE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Civil Action |
| | )   File No. |
| FILMHEDGE, LLC, | ) |
| MEDIAHEDGE, INC., and | ) |
| JONATHAN DWAYNE ("JON") GOSIER, | ) |
| | ) |
|     Defendants. | ) |

_____

**COMPLAINT**

Plaintiff William Striebe ("Striebe" or "Plaintiff") brings this Complaint

against Defendants FilmHedge, LLC, MediaHedge, Inc., and Jonathan D. Gosier

(collectively, the "Defendants") and shows the Court the following:

## I. THE PARTIES

1. Plaintiff William Striebe is a natural person domiciled in the State of Florida

   and resides in Palm Beach Gardens, Palm Beach County, Florida.

2. Florida is Plaintiff Striebe's state of domicile and citizenship.

3. Defendant FilmHedge, LLC ("FilmHedge") is a limited liability company

   organized under the laws of the State of Delaware, with a principal office

address of 8735 Dunwoody Place, Suite R, Atlanta, Fulton County, Georgia 30350.

4. Defendant FilmHedge has one member: Defendant Jonathan Dwayne ("Jon") Gosier.

5. Defendant Jonathan D. Gosier ("Gosier") is a natural person who is domiciled in the State of Georgia.

6. Defendant Gosier resides at 3338 Peachtree Road, NE, Apt. 1208, Atlanta, Georgia 30326-1465.

7. Georgia is Defendant Gosier's state of domicile and citizenship.

8. Since Defendant FilmHedge's sole member, Defendant Gosier, is a citizen of Georgia, Defendant FilmHedge is a citizen of the States of Georgia and Delaware for purposes of diversity jurisdiction.

9. Defendant MediaHedge, Inc. ("MediaHedge") is a corporation incorporated under the laws of the State of Delaware.

10. Defendant MediaHedge's principal place of business is in the State of Georgia, with a principal office address of 8735 Dunwoody Place, Suite R, Atlanta, Fulton County, Georgia 30350. Defendant MediaHedge also operates from offices at 3017 Bolling Way NE, Office 224, Atlanta, Georgia 30305.

11. Defendant Gosier is the sole shareholder of Defendant MediaHedge and serves as its Chief Executive Officer.

12. Since Defendant MediaHedge is incorporated in Delaware and maintains its principal place of business in Georgia, Defendant MediaHedge is a citizen of the State of Georgia and the State of Delaware for purposes of diversity jurisdiction. 28 U.S.C. § 1332(c)(1).

13. Defendant Gosier serves as Chief Executive Officer of Defendant MediaHedge and as Authorized Signer of Defendant FilmHedge.

14. Defendant FilmHedge is a wholly-owned operating subsidiary of Defendant MediaHedge.

15. The wire instructions provided to Plaintiff Striebe in connection with the SAFE investment described below expressly confirmed that "FilmHedge LLC is an operating subsidiary of, and 100% owned by, MediaHedge Inc."

## II.  <u>JURISDICTION AND VENUE</u>

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists between Plaintiff and all Defendants, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

17. Plaintiff Striebe is a citizen of the State of Florida. Defendant Gosier is a citizen of the State of Georgia. Defendant FilmHedge is a citizen of the

States of Georgia and Delaware. Defendant MediaHedge is a citizen of the States of Georgia and Delaware.

18. No Defendant, nor any member or shareholder of any Defendant, is a citizen of the State of Florida.

19. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises in part under the laws of the United States, including the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

20. This Court has supplemental jurisdiction over the remaining state-law claims pursuant to 28 U.S.C. § 1367(a).

21. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because all Defendants reside in this judicial district, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the execution and negotiation of the operative agreements and the operation of the Defendants' businesses from their Atlanta, Georgia offices.

22. Venue is further proper in this District under Section G of the Amendment referenced below and under the forum-selection provisions applicable to the operative instruments.

### III.  FACTS

#### A.  *Corporate Structure*

23. Defendant FilmHedge is a wholly-owned operating subsidiary of Defendant MediaHedge, a Delaware corporation.

24. Defendant Gosier serves as Chief Executive Officer of Defendant MediaHedge and as Authorized Signer of Defendant FilmHedge.

25. Both entities operate from shared office space in Atlanta, Georgia.

#### B.  *Defendant Gosier's Pre-Investment Solicitation Representations*

26. On or about February 24, 2025, Defendant Gosier emailed Plaintiff Striebe and solicited Plaintiff's participation in FilmHedge's "microlender" program.

27. In that solicitation and related communications, Defendant Gosier made the following material written representations to induce Plaintiff Striebe to invest:

(a) *Zero Defaults*. Defendant Gosier represented that FilmHedge had experienced zero defaults on both its film loans and its repayments to microlenders since 2019, across more than thirty film transactions.

(b) *Corporate Guarantee*. Defendant Gosier represented that FilmHedge extended a corporate guarantee to all microlenders, meaning that the company would repay principal plus interest from its own resources even if underlying film deals underperformed.

(c) *Professional Advisors*. Defendant Gosier identified a list of professional advisors engaged by the company, including Holland & Knight, Nelson Mullins, Mauldin & Jenkins CPA, RSM, Synesis Group, and SetApart to create the impression of institutional rigor and legitimacy.

(d) *Loan Tape Evidence*. Defendant Gosier attached the "Consolidated FH Loan Tapes 2019-2025" as documentary evidence purporting to support his zero-default representation.

(e) In both written and oral statements, Defendant Gosier stated to Plaintiff Striebe that Defendant FilmHedge was backed by $350,000,000.00 in institutional investment "from the likes of Apollo, Jefferies, and Carlyle," which are well-known private equity/private credit firms.

### C.  The $250,000 Co-Lender Commitment Letter

28. On March 11, 2025, Plaintiff Striebe signed a Co-Lender Commitment Letter committing $250,000 to Defendant FilmHedge (the "Commitment Letter"). Attached hereto as Exhibit "A" is a true and correct copy of the Commitment Letter.

Defendant Gosier signed the Commitment Letter in dual capacities: as Authorized Signer of Defendant FilmHedge, LLC, and as Chief Executive Officer of Defendant MediaHedge, Inc.

29. Both entities are parties to the Commitment Letter and both entities are contractually obligated to perform under its terms.

30. Plaintiff Striebe executed the Commitment Letter in his individual capacity.

31. On March 12, 2025, Plaintiff Striebe funded the full $250,000 commitment.

32. Under the terms of the Commitment Letter, $295,000 (representing principal plus 18% interest) became due and payable at maturity on March 13, 2026.

33. The Commitment Letter provides that "Time and strict performance are of the essence."

34. The Commitment Letter is governed by Georgia law.

35. Starting in May 2025, Defendant Gosier represented to Plaintiff Striebe in writing that FilmHedge had secured a $750,000,000.00 credit line from Jefferies & Company that would "support dramatic growth;" "increase profitability;" and "drive the enterprise value;" that FilmHedge had already passed Jefferies' compliance and due diligence review, and that the transaction was moving to closing. This representation regarding the Jefferies' credit facility was a material inducement to Plaintiff Striebe's decision to invest.

### D.  *The $300,000.00 MediaHedge SAFE*

36. On June 10, 2025, Plaintiff Striebe invested an additional $300,000.00 in Defendant MediaHedge through a Simple Agreement for Future Equity (the "SAFE"). Attached hereto as Exhibit "B" is a true and correct copy of the SAFE.

37. The SAFE is governed by Delaware law without regard to conflict-of-law principles.

38. The SAFE carries a $50,000,000 Pre-Money Valuation Cap and converts to preferred equity upon an Equity Financing, Liquidity Event, or Dissolution Event as those terms are defined in the SAFE.

39. Pursuant to the terms of the SAFE, in the event of a Dissolution Event, Plaintiff Striebe is entitled to receive his $300,000 Cash-Out Amount before any distributions to common equity holders.

40. Defendants have not disclosed any Equity Financing, Liquidity Event, or Dissolution Event to Plaintiff Striebe.

41. No distribution has been made to Plaintiff Striebe under the SAFE.

42. Section 3(b) of the SAFE contains an express representation by Defendant MediaHedge that "This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms."

43. Section 3(b) also represents that Defendant MediaHedge is not in material violation of any debt or contract to which it is bound where such violation could reasonably have a material adverse effect.

## E. Defendant Gosier's Undisclosed Financial Condition

44. On March 6, 2025 - five days before the Commitment Letter was executed - Defendant Gosier submitted a personal financial statement to Bank of America.

45. That financial statement disclosed, among other things, that: (a) FilmHedge was carried as a business asset with a present valuation of $50,000,000 and related debt of $50,000,000, reflecting no net equity value in the entity; (b) FilmHedge's net operating revenue was approximately $800,000 annually; and (c) Defendant Gosier's liquid cash consisted of approximately $1,000,000 held at Morgan Stanley, with his remaining claimed net worth tied up in illiquid private business interests.

46. The facts disclosed in the Bank of America financial statement, known to Defendant Gosier at the time of his February 2025 solicitation and his March 2025 execution of the Commitment Letter, contradicted his representations regarding zero defaults and the sufficiency of the corporate guarantee.

### F. *Undisclosed Financial Distress and the Colbeck Situation*

47. The Colbeck Capital Management Proposal Letter, dated February 20, 2026 and signed by Defendant Gosier on February 24, 2026, amends and restates a prior Colbeck proposal dated November 26, 2025.

48. MediaHedge therefore had been seeking to replace its Jefferies credit facility with Colbeck as early as November 2025, months before the March 13, 2026 maturity date and well before Defendant Gosier gave any indication to Plaintiff Striebe that there might be any payment difficulty.

49. The Jefferies credit facility had been a centerpiece of Defendant Gosier's pre-investment representations to Plaintiff Striebe. As described above, prior to Plaintiff Striebe's investment, Defendant Gosier had represented in writing that FilmHedge had secured a $750,000,000.00 credit line from Jefferies & Company that would "supercharge the business and support dramatic growth," had passed Jefferies' compliance and due diligence, and was moving to closing. After Plaintiff Striebe's investment, when Plaintiff Striebe inquired about the status of the Jefferies transaction, Defendant Gosier represented that Jefferies was "all set" and was merely working on its preferred form of completion bond with its lawyers. Defendant Gosier thereafter abandoned the Jefferies narrative and pivoted to other memoranda of understanding and ultimately to the Colbeck transaction — without ever

disclosing that the $750,000,000.00 credit facility he had touted as nearly closed had never in fact materialized.

50. The Colbeck term sheet is non-binding. The term sheet states in bold capital letters that it "shall be non-binding and shall not in any way obligate Colbeck or any of its affiliates (or any other party) to perform any transaction outlined or described herein."

51. Colbeck's willingness to fund is conditioned on "completion of all legal and business due diligence" and on satisfaction of conditions "in Colbeck's sole discretion."

52. Notwithstanding the non-binding character of the Colbeck term sheet, Defendant Gosier repeatedly characterized the Colbeck transaction to Plaintiff Striebe as a near-certain, imminent closing.

53. Those characterizations were materially misleading.

54. The Colbeck arrangement required FilmHedge to pay a $500,000 legal deposit to Colbeck, to maintain a $2 million liquidity reserve, and to secure $2–3 million in additional equity capital—substantial cash demands on a company with only approximately $800,000 in annual operating revenue that simultaneously claimed a corporate guarantee obligation to all microlenders.

55. The Colbeck transaction was not an isolated proposed financing. In October 2025, in addition to a contemporaneous Jefferies negotiation, Defendant Gosier transmitted to Plaintiff Striebe several other unsigned, non-binding term sheets from prospective lenders, none of which closed.

56. Upon information and belief, the Jefferies facility never closed, and Defendant Gosier continued to pursue Colbeck and other prospective lenders thereafter while continuing to represent to Plaintiff Striebe that institutional financing was imminent.

## G. *Default, Post-Default Conduct, and the Wire Instruction Issue*

57. The March 13, 2026 maturity date of the Commitment Letter passed without any payment from Defendants to Plaintiff Striebe.

58. Plaintiff Striebe had provided his UMB Bank wire instructions, including account number ending in –8698 and routing number ending in –5681, in the body of his February 26, 2026 email to Defendant Gosier.

59. On March 13, 2026, Defendant Gosier falsely represented to Plaintiff Striebe that Plaintiff's "original email said they are attached but the message is clipped so we can't see the attachment."

60. The payment instructions were not provided as an attachment. Plaintiff Striebe had written the payment instructions directly in the body of his email.

61. Defendant Gosier intentionally truncated or disregarded the email to manufacture a pretext for non-payment.

62. Defendant Gosier's own April 14, 2026 email to Plaintiff Striebe attached Plaintiff Striebe's original February 26, 2026 email — the very email Defendant Gosier had earlier represented was "clipped" — confirming that the email reached Defendant Gosier intact and refuting his prior representation.

63. On March 22, 2026, Defendant Gosier offered Plaintiff Striebe "penalty interest or a $25,000 equity grant" as a settlement for the delay, in lieu of the cash repayment of the full $295,000 then past due.

64. That offer constitutes a tacit acknowledgment that Defendants had defaulted.

65. In a subsequent written communication, Defendant Gosier stated that he was not paying Plaintiff Striebe's matured loan because non-payment was "necessary for the good of the shareholders."

66. That statement misrepresents Defendants' legal obligations. Under Georgia law, creditors hold priority over shareholders.

67. The statement also constitutes an admission that the non-payment was willful and deliberate rather than the product of inability to pay.

68. A press release published by Deadline.com on April 2, 2026 announced a MediaHedge $200 million joint venture fund but did not identify the

institutional partner and referenced "Koo Capital" as arranger rather than Colbeck—inconsistent with Defendant Gosier's earlier representations to Plaintiff Striebe about the Colbeck transaction.

69. On or about April 27, 2026, Defendant Gosier transmitted to Plaintiff Striebe an updated MediaHedge investor deck. The deck reported FilmHedge historical revenue of $5.8 million for 2024 and $6.0 million for 2025.

70. Those figures are irreconcilable with the approximately $800,000.00 in annual operating revenue Defendant Gosier had certified to Bank of America on March 6, 2025 in his personal financial statement.

71. The deck also repeated the representation that FilmHedge had achieved "$200M deployed, $230M returned (2020-2024)" on "40+ deals" with a "0% Default Rate," notwithstanding the Night and Day cease-and-desist letter, the pre-solicitation defaults to outside vendors, and the financial condition Defendant Gosier had certified to Bank of America.

72. The April 27, 2026 deck reflects a continuing course of post-investment misrepresentation.

73. As of the date of this Complaint, Defendants have paid nothing to Plaintiff Striebe on the $295,000 obligation under the Commitment Letter and have paid nothing to Plaintiff Striebe on the $300,000 invested under the SAFE.

## COUNT I

## BREACH OF CONTRACT—COMMITMENT LETTER
### (Against Defendants FilmHedge, LLC and MediaHedge, Inc.)

74. Plaintiff Striebe repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

75. The Commitment Letter is a valid, binding contract, executed by Plaintiff Striebe and accepted and agreed to by Defendant FilmHedge (through Defendant Gosier as Authorized Signer) and Defendant MediaHedge (through Defendant Gosier as CEO).

76. Defendants FilmHedge and MediaHedge materially breached the Commitment Letter by failing to pay $295,000 on the March 13, 2026 maturity date.

77. The Commitment Letter expressly provides that "Time and strict performance are of the essence."

78. Plaintiff Striebe performed all conditions precedent to Defendants' payment obligations.

79. Any asserted defense based on a minimum liquidity covenant contained in a subsequent third-party facility does not excuse or extinguish Defendants' preexisting, independently governed obligation to Plaintiff Striebe.

80. A party cannot use a voluntarily assumed obligation to a third party as a shield against performance of a prior contractual duty.

81. As a direct and proximate result of Defendants' breach, Plaintiff Striebe has been damaged in an amount not less than $295,000, plus pre- and post-judgment interest at the contract rate of 18% per annum, plus reasonable attorneys' fees and expenses of litigation under O.C.G.A. § 13-6-11.

**COUNT II**

**BREACH OF CONTRACT—MEDIAHEDGE SAFE**
**(Against Defendant MediaHedge, Inc.)**

82. Plaintiff Striebe repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

83. The SAFE is a valid, binding instrument, executed by Plaintiff Striebe and by Defendant MediaHedge through Defendant Gosier as its Chief Executive Officer.

84. Section 3(b) of the SAFE contains an express representation by Defendant MediaHedge that the SAFE "constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms."

85. Upon information and belief, Defendant MediaHedge is experiencing financial distress of a character sufficient to constitute a Dissolution Event within the meaning of the SAFE, including voluntary termination of operations, a general assignment for the benefit of creditors, or any other liquidation, dissolution, or winding up of the company.

86. Upon the occurrence of a Dissolution Event, Plaintiff Striebe is automatically entitled to his $300,000 Cash-Out Amount before any distribution to common equity holders.

87. Defendant MediaHedge has also breached the Section 3(b) representations and warranties.

88. The representations made in Section 3(b) were false or materially inaccurate when made because, at the time the SAFE was issued, Defendant MediaHedge was in material breach of debts and contracts to which it was bound and was operating under financial conditions inconsistent with its representations to investors.

89. As a direct and proximate result of Defendant MediaHedge's breaches, Plaintiff Striebe has been damaged in an amount not less than $300,000, plus applicable interest, plus reasonable attorneys' fees and expenses of litigation, or, in the alternative, rescission of the SAFE and return of the $300,000 purchase price.

## COUNT III
### FRAUDULENT INDUCEMENT
### (Against All Defendants)

90. Plaintiff Striebe repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

91. Defendant Gosier, acting individually and on behalf of Defendants FilmHedge and MediaHedge, made material misrepresentations of fact to Plaintiff Striebe in February 2025 to induce Plaintiff Striebe to invest in the Commitment Letter and the SAFE.

92. Those misrepresentations included the representations that FilmHedge had experienced zero defaults since 2019, that FilmHedge extended a corporate guarantee to all microlenders such that the company would repay principal and interest from its own resources, and that FilmHedge operated under the professional oversight of the institutional advisors Defendant Gosier identified.

93. The zero-default representation was false when made.

94. In late 2024 — before Defendant Gosier's February 2025 solicitation — Defendant Gosier defaulted on a film-financing transaction with the producer of the film "Night and Day."

95. Defendant Gosier had met the producer at the 2024 Cannes Film Festival, sought to be lead financier of the film, and advanced $185,000 in bridge financing.

96. The producer, dissatisfied with Defendant Gosier's failure to attend negotiations, his apparent unfamiliarity with film financing, and the conduct

of his counsel, in October 2024 moved the financing to another party, returned the $185,000 to Defendant Gosier, and settled with him.

97. When Defendant Gosier nevertheless continued to claim — both publicly and to investors, including Plaintiff Striebe — that he was financing the film, the producer issued a cease-and-desist letter to Defendant Gosier.

98. Two parallel United Kingdom producer transactions on which Defendant Gosier was working in the same period also failed to close, and United Kingdom insurance markets did not regard Defendant Gosier as a credible film financier.

99. Before Defendant Gosier's February 2025 solicitation, Defendant Gosier also had defaulted on at least two outside vendors engaged on FilmHedge projects, including the software FilmHedge publicly claimed to have developed.

100. One of those vendor claims was filed in California; Defendant Gosier failed to appear and mount any defense, and the clerk entered default against him.

101. Notwithstanding the Night and Day cease-and-desist letter and the failed United Kingdom transactions, on March 12, 2025 — one day after Plaintiff Striebe signed the Commitment Letter and on the same day Plaintiff Striebe funded the $250,000 commitment — Defendant Gosier wrote in a

general investor update that "We are happy to report the on-balance sheet deals are performing exactly as projected. Not only did we hit our proforma projections, but we exceeded some of them."

102.   That representation was false when made and confirms Defendant Gosier's continuing course of misrepresentation regarding FilmHedge's default-free history and operating performance.

103.   The corporate-guarantee representation was false when made or was made with reckless disregard for its truth.

104.   Defendant Gosier's own financial statement, signed on March 6, 2025, disclosed that FilmHedge carried $50 million in debt against a $50 million valuation and generated only approximately $800,000 in annual operating revenue.

105.   A company with that capital structure cannot in good faith guarantee the principal and interest of all microlender positions from its own resources.

106.   Upon information and belief, completion-bond and performance-bond underwriters viewed FilmHedge unfavorably in light of Defendant Gosier's lack of credibility as a film financier — an independent, arms-length professional assessment that FilmHedge could not make good on its performance obligations.

107.    The professional-advisor representation was misleading to the extent any of the identified relationships were nominal, outdated, or not actively engaged in overseeing the company's financial governance.

108.    Defendant Gosier made each of the foregoing misrepresentations knowingly or with reckless disregard for the truth.

109.    Defendant Gosier, as founder and Chief Executive Officer, is presumed to know the financial condition of the companies he controls.

110.    The personal financial statement that Defendant Gosier submitted to Bank of America on March 6, 2025—five days before the Commitment Letter was signed—demonstrates his contemporaneous knowledge of FilmHedge's financial profile.

111.    Defendant Gosier cannot credibly claim ignorance of the facts he certified to his own bank under penalty of federal law.

112.    Defendant Gosier made each of the foregoing misrepresentations with the intent to induce Plaintiff Striebe's reliance and Plaintiff Striebe's investment.

113.    Plaintiff Striebe justifiably relied on Defendant Gosier's misrepresentations in deciding to invest $250,000 on March 12, 2025 and an additional $300,000 on June 10, 2025.

114. As a direct and proximate result of Defendants' fraudulent inducement, Plaintiff Striebe has been damaged in an amount not less than $595,000, plus punitive damages available under O.C.G.A. § 51-12-5.1 for intentional fraud, plus attorneys' fees and expenses of litigation.

## COUNT IV
## FRAUDULENT MISREPRESENTATION
## POST-INVESTMENT CONDUCT
### (Against Defendant Gosier)

115. Plaintiff Striebe repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

116. On March 13, 2026, Defendant Gosier falsely represented to Plaintiff Striebe that Plaintiff's February 26, 2026 email conveying wire instructions contained the instructions "as an attachment" that was "clipped" and therefore unreadable.

117. That representation was false. Plaintiff Striebe had placed the payment instructions directly in the body of the email.

118. Defendant Gosier's own April 14, 2026 email to Plaintiff Striebe attached the very February 26, 2026 email Defendant Gosier had previously claimed was "clipped," confirming that the email reached Defendant Gosier intact and refuting his prior representation.

119.    Defendant Gosier made that false statement to delay Plaintiff Striebe's enforcement of his rights and to manufacture a fraudulent dispute of fact regarding delivery of wire instructions.

120.    Defendant Gosier also repeatedly mischaracterized the Colbeck transaction to Plaintiff Striebe as a near-certain, imminent closing, notwithstanding the express, bold, capitalized non-binding language of the Colbeck term sheet itself.

121.    Those characterizations were materially misleading and were made to induce Plaintiff Striebe's forbearance from enforcement.

122.    On March 22, 2026, Defendant Gosier provided Plaintiff Striebe with unsigned internal documents that Defendant Gosier represented as "closing documents."

123.    Those unsigned internal documents did not evidence any closing and were materially misleading.

124.    Defendant Gosier subsequently stated in writing that he was not paying Plaintiff Striebe's matured loan because non-payment was "necessary for the good of the shareholders."

125.    That statement constitutes an admission that the non-payment was willful and deliberate, and it misrepresents Defendant Gosier's legal obligations.

126.    Plaintiff Striebe relied on Defendant Gosier's post-investment misrepresentations to his detriment by forbearing from prompt enforcement of his rights.

127.    As a direct and proximate result of Defendant Gosier's fraudulent misrepresentations, Plaintiff Striebe has been damaged in an amount to be proven at trial, plus punitive damages and attorneys' fees and expenses of litigation.

**COUNT V**

**NEGLIGENT MISREPRESENTATION**
**(Against All Defendants) (Pleaded in the Alternative)**

128.    Plaintiff Striebe repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

129.    In the alternative to Counts III and IV, and pleaded in the alternative to the extent any intentional-scienter element is not established, Plaintiff Striebe asserts a claim for negligent misrepresentation against Defendants.

130.    Defendant Gosier, in the course of business and in the course of transactions in which he and Defendants FilmHedge and MediaHedge had a direct pecuniary interest, supplied false information for the guidance of Plaintiff Striebe in his business decisions.

131.    Defendants failed to exercise reasonable care in obtaining or communicating the information.

132. Defendant Gosier occupied a position of informational superiority regarding FilmHedge's financial condition and operating history.

133. Defendant Gosier lacked a reasonable basis for the representations he made in light of the facts certified to Bank of America five days after his solicitation.

134. Plaintiff Striebe justifiably relied on the information supplied by Defendants.

135. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff Striebe has been damaged in an amount not less than $595,000, plus attorneys' fees and expenses of litigation.

## COUNT VI

### BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING
### (Against Defendants FilmHedge, LLC and MediaHedge, Inc.)

136. Plaintiff Striebe repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

137. Georgia and Delaware each recognize an implied covenant of good faith and fair dealing in every contract. That covenant applies to the Commitment Letter and to the SAFE.

138. After the default on the Commitment Letter, Defendants engaged in a pattern of conduct designed to delay Plaintiff Striebe's enforcement, to

create false factual disputes, and to avoid the obligation rather than satisfy it. That conduct includes, among other things: (a) falsely claiming the wire instructions were unreadable as an attachment; (b) repeatedly attributing non-payment to shifting, unverified third-party covenants; (c) offering a $25,000 equity grant and penalty interest in lieu of the full $295,000 cash obligation; (d) providing unsigned internal documents misrepresented as evidence of deal progress; (e) failing to respond to Plaintiff Striebe's March 13, 2026 email despite having agreed to make payments; (f) stating in writing that Defendant Gosier was not paying the matured debt because non-payment was "necessary for the good of the shareholders;" and (g) failing to respond to Plaintiff Striebe's request for the bank documentation purportedly evidencing Defendant Gosier's failed transfer attempt and the amount Defendant Gosier purportedly sought to transfer.

139.    Defendants' post-default conduct, taken as a whole, demonstrates a systematic effort to deprive Plaintiff Striebe of the fruits of his contracts in violation of the implied covenant of good faith and fair dealing.

140.    As a direct and proximate result of Defendants' conduct, Plaintiff Striebe has been damaged in an amount not less than $595,000, plus attorneys' fees and expenses of litigation under O.C.G.A. § 13-6-11.

## COUNT VII

## UNJUST ENRICHMENT

### (Against All Defendants) (Pleaded in the Alternative)

141. Plaintiff Striebe repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

142. In the alternative to the contract claims set forth above, and pleaded in the event any Defendant challenges the enforceability of the Commitment Letter or the SAFE, Plaintiff Striebe asserts a claim for unjust enrichment.

143. Plaintiff Striebe conferred upon Defendants a benefit of $595,000 in invested funds: $250,000 funded under the Commitment Letter on March 12, 2025, and $300,000 funded under the SAFE on June 10, 2025.

144. Defendants have accepted and retained the benefit of those funds under circumstances that render it inequitable for Defendants to retain the funds without returning them.

145. Defendants have repaid no principal on the Commitment Letter, have converted no equity under the SAFE, and have delivered no value in return to Plaintiff Striebe.

146. Equity and good conscience require that Defendants return the $595,000 in restitution to Plaintiff Striebe.

## COUNT VIII
## SECURITIES FRAUD
### (Against All Defendants)

147.    Plaintiff Striebe repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

148.    The SAFE is a security within the meaning of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1), and the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10).

149.    The Commitment Letter also constitutes a security under the *Howey* test and the "notes" analysis, given its investment character, its fixed return, its reliance on a corporate guarantee, and the absence of any active role by Plaintiff Striebe in the enterprise.

150.    In connection with the offer, sale, and purchase of each of these securities, Defendants used the means and instrumentalities of interstate commerce, including email, to make material misrepresentations and omissions of material fact.

151.    Defendants' material misrepresentations include, without limitation, the zero-default representation, the corporate-guarantee representation, and the representation of FilmHedge's financial condition and performance.

152.    Defendants' material omissions include, without limitation, the pre-solicitation defaults to outside vendors, the refusal of commercial insurers to

issue performance bonds for FilmHedge, and the material differences between the representations made to Plaintiff Striebe and the facts Defendant Gosier contemporaneously certified to Bank of America.

153. In August 2025, key persons associated with the origination, underwriting, and risk management of FilmHedge's film financing departed the company.

154. Plaintiff Striebe executed the SAFE on June 10, 2025.

155. Upon information and belief, at the time of execution Defendant Gosier knew or reasonably should have known that the departure of these key personnel was imminent and would materially affect FilmHedge's origination, underwriting, and risk-management capabilities.

156. Defendant Gosier did not disclose to Plaintiff Striebe — before, contemporaneously with, or after the SAFE — the impending or completed departure of these key personnel.

157. Defendants acted with scienter in making these misrepresentations and omissions.

158. Plaintiff Striebe justifiably relied on Defendants' misrepresentations and omissions in purchasing the securities.

159. Defendants are liable to Plaintiff Striebe for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

160. Defendants are further liable under the Georgia Uniform Securities Act, O.C.G.A. § 10-5-1 et seq., and under the Florida Securities and Investor Protection Act, Fla. Stat. § 517.301, because Plaintiff Striebe is a Florida resident who received the solicitation in Florida.

161. Upon information and belief, the instruments were not registered with the Securities and Exchange Commission or any state securities regulator, and no valid exemption from registration applied.

162. Plaintiff Striebe is entitled to rescission under Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(1), and the corresponding state statutes.

163. As a direct and proximate result of Defendants' securities violations, Plaintiff Striebe has been damaged in an amount not less than $595,000, plus interest, plus attorneys' fees and costs.

## COUNT IX

## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (FLA. STAT. § 501.201 et seq.)
### (Against All Defendants)

164. Plaintiff Striebe repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

165. Plaintiff Striebe is a resident of Palm Beach Gardens, Florida.

166. Defendant Gosier directed his February 2025 solicitation emails to Plaintiff Striebe in Florida.

167. Plaintiff Striebe received those emails in Florida.

168. Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. ("FDUTPA"), prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

169. Defendants' false representations concerning zero defaults, the corporate guarantee, and the company's financial condition constitute deceptive acts in the conduct of trade or commerce directed at a Florida consumer.

170. Defendants' conduct was objectively deceptive and caused Plaintiff Striebe actual damages in an amount not less than $595,000.

171.    Plaintiff Striebe is entitled under FDUTPA to recover actual damages, attorneys' fees, and costs pursuant to Fla. Stat. § 501.2105.

## COUNT X
## PERSONAL LIABILITY / PIERCING THE CORPORATE VEIL
### (Against Defendant Jonathan D. Gosier)

172.    Plaintiff Striebe repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

173.    Defendant Gosier is personally liable under the fraud and misrepresentation counts of this Complaint regardless of his corporate roles, because fraud is a personal tort and an individual who personally participates in a tortious act is individually liable without regard to his corporate capacity.

174.    The facts alleged in this Complaint support piercing the corporate veil of Defendants FilmHedge and MediaHedge to hold Defendant Gosier personally liable on the contractual claims, on the following alternative theories:

*(a) Alter Ego*. Upon information and belief, Defendant Gosier commingled his personal finances with corporate funds, failed to maintain adequate corporate formalities, and used the corporate form of Defendants FilmHedge and MediaHedge to defraud creditors, including Plaintiff Striebe.

*(b) Undercapitalization*. Defendant FilmHedge carried approximately $50 million in debt against only approximately $800,000 in annual operating revenue, held insufficient liquid assets to repay a $295,000 matured loan, and simultaneously claimed an outstanding corporate guarantee obligation to all microlenders. While Plaintiff Striebe's matured debt went unpaid, Defendant Gosier offered Plaintiff Striebe accommodations at a multi-floor Cannes apartment with an indoor pool that the company rented, paid to co-sponsor a business forum at Cannes for a second consecutive year, and continued to travel extensively and maintain a lavish personal lifestyle. The diversion of corporate or personal resources to luxury expenditures while creditor obligations remained unsatisfied establishes that the entities were undercapitalized from inception and demonstrates commingling and willful misuse of the corporate form.

*(c) Direct Participation.* Defendant Gosier personally signed both investment instruments, personally made all material representations described in this Complaint, and personally directed the post-default avoidance conduct.

175.    As a direct and proximate result of Defendant Gosier's conduct, Plaintiff Striebe has been damaged in an amount not less than $595,000, plus

punitive damages under O.C.G.A. § 51-12-5.1, plus attorneys' fees and expenses of litigation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff William Striebe respectfully prays that the Court grant the following relief:

A. That process issue as provided by law;

B. That the Court enter judgment in favor of Plaintiff Striebe and against Defendants FilmHedge, LLC and MediaHedge, Inc., jointly and severally, on Count I in an amount not less than $295,000, plus interest at the contractual rate of 18% per annum;

C. That the Court enter judgment in favor of Plaintiff Striebe and against Defendant MediaHedge, Inc. on Count II in an amount not less than $300,000, plus applicable interest, or, in the alternative, rescission of the SAFE and return of the $300,000 purchase price;

D. That the Court enter judgment in favor of Plaintiff Striebe and against all Defendants, jointly and severally, on Counts III, IV, and V in an amount not less than $595,000, plus punitive damages pursuant to O.C.G.A. § 51-12-5.1;

E.  That the Court enter judgment in favor of Plaintiff Striebe and against Defendants FilmHedge, LLC and MediaHedge, Inc. on Count VI for breach of the implied covenant of good faith and fair dealing;

F.  That the Court enter judgment in favor of Plaintiff Striebe and against all Defendants on Count VII in an amount not less than $595,000 as restitution under the doctrine of unjust enrichment;

G.  That the Court enter judgment in favor of Plaintiff Striebe and against all Defendants on Count VIII for violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, the Georgia Uniform Securities Act, and the Florida Securities and Investor Protection Act, with rescission of the instruments or, in the alternative, actual damages not less than $595,000, plus interest, attorneys' fees, and costs;

H.  That the Court enter judgment in favor of Plaintiff Striebe and against all Defendants on Count IX for violations of the Florida Deceptive and Unfair Trade Practices Act, with actual damages, attorneys' fees, and costs pursuant to Fla. Stat. § 501.2105;

I.  That the Court enter judgment in favor of Plaintiff Striebe and against Defendant Jonathan D. Gosier, individually, on Count X, piercing the corporate veil of Defendants FilmHedge, LLC and MediaHedge, Inc. and holding Defendant Gosier personally liable;

J.  That the Court award Plaintiff Striebe his attorneys' fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11 and all other applicable statutes;

K.  That the Court award Plaintiff Striebe prejudgment and post-judgment interest at the maximum rate allowed by law; and

L.  That the Court grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Striebe demands a trial by jury on all claims so triable. The Commitment Letter contains a jury-trial waiver limited to contract disputes arising out of that instrument; it does not extend to the tort, fraud, statutory, or equitable claims asserted in this Complaint. The SAFE contains no jury-trial waiver.

Respectfully submitted this 13th day of May 2026.


*/s/ Frank G. Goldman, Esq.*
Frank G. Goldman, Esq.
Georgia Bar No. 30052
Frank G. Goldman, P.C.
PO Box 202
Avondale Estates, GA 30002
(404) 918-9145
fgoldman@fggpc.com
Counsel for Plaintiff William Striebe

**Date: March 11ᵗʰ, 2025**

William Striebe
1118 Faulkner Terrace
Palm Beach Gardens, Florida
33418

Re:    $250,000 (the "**Transaction Amount**")

Dear Mr. Gosier:

FilmHedge, LLC. (the "Company") has advised William Striebe ("**Buyer**") that it is seeking a commitment in the aggregate principal amount of $250,000 (the "**Transaction**"), upon the terms and conditions set forth in this letter (the "**Commitment Letter**").

**Commitment**. Based upon and subject to the terms and conditions set forth in this Commitment Letter, Buyer is pleased to advise the Company of its commitment to the agreed upon transaction (the "**Commitment**").

**Terms**. The Lender's commitment is subject to the following terms:

- **Credits:** Upon receipt of the proceeds, Lender shall receive 250 points in the company's ScreenPoints platform which can be redeemed for 1 [one] 'Executive Producer' screen credit in any listed production, or 2 [two] 'Co-Executive Producer' screen credits in any listed productions. Redeeming credits will allow the buyer to be invited to film premiers, red carpet events, or private screenings related to any film or television production the points are redeemed for.
- **Updates:** The buyer will receive monthly updates.
- **Committed Amount:** $250,000
- **Funding Date:** March 12th, 2025
- **Maturity Date:** March 13th, 2026
- **Amount to be Paid to Buyer at Maturity:** Fixed amount of $295,000 (the committed amount plus eighteen [18%] percent); Buyer will have the option to refer redemption to a later date at their discretion.
- **Purpose of Transaction:** 250 points to be redeemed for screen credits and additional points to be redeemed for cash at maturity.

**Expenses.**    Each party shall bear its own costs and expenses in relation to the transaction.

**Revocation and Termination of Commitment**.    Time and strict performance are of the essence with respect to the terms, conditions and provisions of this Commitment Letter.

**General Terms.**    This Commitment Letter supersedes all prior term sheets, discussions,

Exhibit "A"

Page 2

indications of interest and proposals (whether oral or written) previously delivered to the Company.  This Commitment Letter may not be modified, amended or supplemented, except by a document in writing signed by the parties hereto. The Company may not assign this Commitment.

**Governing Law; Waiver of Trial by Jury.**   This Commitment Letter shall be governed by and construed in accordance with the laws of the State of Georgia. Company and Buyer hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort, or otherwise) arising out of or relating to this Commitment (including, without limitation, the Term Sheet), and the other transactions contemplated hereby or the actions of Buyer in the negotiation, performance or enforcement hereof.  This Commitment may be executed in counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one and the same instrument.

We look forward to working with you on this transaction.

Very truly yours,

Signed by:

Willaim Striebe

**ACCEPTED AND AGREED TO:**

As of March 11th, 2025

**FILMHEDGE, LLC**

By: Jon Gosier
Name: Jonathan Gosier
Title: Authorized Signer

**MEDIAHEDGE, INC**

By: Jon D. Gosier
Name: Jonathan Gosier
Title: CEO

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## MEDIAHEDGE INC.

### SAFE
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by William Striebe (the "**Investor**") of $300,000.00 (the "**Purchase Amount**") on or about 6/10/2025 (the "**Date**"), Mediahedge Inc., a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

The "**Pre-Money Valuation Cap**" is $50,000,000. See **Section 2** for certain additional defined terms.

1. *Events*

(a) **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.

In connection with the automatic conversion of this Safe into shares of Standard Preferred Stock or Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b) **Liquidity Event**. If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**"). If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(c) **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**. In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock. The Investor's right to receive its Cash-Out Amount is:

Exhibit "B"

(i)     Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii)     On par with payments for other Safes and or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the  nvestor and such other Safes and or Preferred Stock, the applicable Proceeds will be distributed pro rata to the  nvestor and such other Safes and or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii)     Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar li uidation preferences).

(e) **Termination**.  This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the  nvestor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the  nvestor pursuant to Section 1(b) or Section 1(c).

2.  *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the E uity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- ncludes all shares of Capital Stock issued and outstanding;
- ncludes all (i) issued and outstanding Options and (ii) Promised Options;
- ncludes the Unissued Option Pool, including any increase to the Unissued Option Pool in connection with the E uity Financing; and
- Excludes this Safe and all other Converting Securities.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other li uidation, dissolution or winding up of the Company (**excluding** a Li uidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Li uidity Price (treating the dividend date as a Li uidity Event solely for purposes of calculating such Li uidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Li uidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- ncludes all shares of Capital Stock issued and outstanding;
- ncludes, to the extent receiving Proceeds, all (i) issued and outstanding Options and (ii) Promised Options;
- Excludes the Unissued Option Pool; and
- Excludes this Safe and all other Converting Securities.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an nitial Public Offering.

"**Liquidity Price**" means the price per share e ual to the Pre-Money Valuation Cap divided by the Li uidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Li uidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the E uity Financing or Li uidity Event, as applicable (or the initial closing of the E uity Financing or consummation of the Li uidity Event, if there is no term sheet or letter of intent), (ii) in the case of an E uity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Li uidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the nvestor in an E uity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share li uidation preference and the initial conversion price for purposes of price-based anti-dilution protection, which will e ual the Safe Price; and (ii) the basis for any dividend rights, which will be based on the Safe Price.

"**Safe Price**" means the price per share e ual to the Pre-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the E uity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Li uidity Event, only to the extent Proceeds are payable on such Promised Options) under any e uity incentive or similar Company plan.

3. *Company Representations*

(a) The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b) The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c) The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d) No consents or approvals are re uired in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e) To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. *Investor Representations*

(a) The nvestor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes a valid and binding obligation of the nvestor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of e uity.

(b) The nvestor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an E uity Financing, the Company may void this Safe and return the Purchase Amount. The nvestor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration re uirements is available. The nvestor is purchasing this Safe and the securities to be ac uired by the nvestor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the nvestor has no present intention of selling, granting any participation in, or otherwise distributing the same. The nvestor has such knowledge and experience in financial and business matters that the nvestor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such

investment without impairing the nvestor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

**5.** *Miscellaneous*

(a)  Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the nvestor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Pre-Money Valuation Cap" as this Safe (and Safes lacking such term will be considered to be the same with respect to such term), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the nvestor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)  Any notice re uired or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subse uently modified by written notice.

(c)  The nvestor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the nvestor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1. owever, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the nvestor at the same time.

(d)  Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the nvestor, including, without limitation, any general partner, managing member, officer or director of the nvestor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the nvestor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the nvestor, in connection with a reincorporation to change the Company's domicile.

(e)  n the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction.

(g)  The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the nternal Revenue Code of 1986, as amended. Accordingly, the parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

(*Signature page follows*)

N W TNESS W  EREOF, the undersigned have caused this Safe to be duly executed and delivered.

**MEDIAHEDGE INC.**

By:

Jonathan D. Gosier

CEO

Address:

301  Bolling Way NE, Office  224

Atlanta, GA 30305

Email: jon   filmhedge.com

**INVESTOR(S):**

By: William Striebe

Name: William Striebe

Title:

Address: 1118 Faulkner Ter

Palm Beach Gardens, Florida

33418

Email: williamstriebe@icloud.com

Docusign Envelope ID: 20CE5491-0259-40DD-AFC3-287ADEA2D438

**MEDIAHEDGE FORM OF SAFE**

By: _____

Name: _____

Title: _____

Address: _____

_____

_____

Email: _____

## MEDIAHEDGE FORM OF SAFE

### WIRE INSTRUCTIONS

**Make all checks or wires payable to:** Media  edge,  nc.

Film  edge LLC is an operating subsidiary of, and 100% owned by, Media  edge  nc.

| | |
|---|---|
| **Beneficiary:** | Media  edge  nc. |
| **Bank name:** | Truist (BB   T Suntrust) |
| **Bank Address:** | 3  54 Roswell Road, Atlanta, GA 30342-441 |
| **Account name:** | Media   edge |
| **Account number**: | █████5186 |
| **Routing number**: | 061113415 |

**Beneficiary Address:**

Media  edge  nc    Film  edge LLC

301  Bolling Way NE, Office   224

Atlanta, GA 30305

Email:    jon   filmhedge.com